# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

BRADLEY S. PETERS,                                    CIVIL NO. 04-4828 DSD/AJB

                    PLAINTIFF,                        **REPORT AND RECOMMENDATION**
                                                      **ON PARTIES' CROSS MOTIONS**
V.                                                    **FOR SUMMARY JUDGMENT**

JO ANNE B. BARNHART, COMMISSIONER
OF SOCIAL SECURITY,

                    DEFENDANT.
_____

PAUL A. LIVGARD, ESQ., FROM LIVGARD & RABUSE, P.L.L.P., FOR THE PLAINTIFF, BRADLEY S. PETERS

LONNIE F. BRYAN, ESQ., ASSISTANT UNITED STATES ATTORNEY FOR THE COMMISSIONER
_____

## I.      INTRODUCTION

Plaintiff Bradley S. Peters (Peters) disputes the unfavorable decision of the Commissioner of

Social Security Agency (Commissioner) denying disability insurance benefits (DIB) under Title II of the

Social Security Act.  This matter is before the court, United States Magistrate Judge Arthur J. Boylan,

for a report and recommendation to the district court on the parties' cross motions for summary

judgment.  *See* 28 U.S.C. § 636 (b)(1) and Local Rule 72.1.  Based on the reasoning set forth below,

this court **recommends** that Peters' Motion for Summary Judgment [Docket No.9] be **denied** and that

the Commissioner's Motion for Summary Judgment [Docket No. 12] be **granted**.

## II.     PROCEDURAL HISTORY

Peters filed an application for DIB on May 2, 2002, alleging disability due to herpes simplex,

shingles, and back and neck pain with an onset date of March 20, 2001.  (T. 94-96.)  The application

was denied initially and again on request for consideration.   (T. 66-70.)  Peter's requested and

received an administrative hearing.  The hearing was held on January 14, 2004, with Administrative

Law Judge (ALJ) Michael D. Quayle presiding.  On May 15, 2004, the ALJ issued his decision finding

that Peters was not disabled under the Social Security Act because he was capable fo performing jobs

existing in significant numbers in the regional economy. (T. 31.)  The Appeals Council denied Peters'

request for review.  Thus, the ALJ decision became the final decision of the Commissioner.   Peters

filed an action in federal district court pursuant to 42 U.S.C. § 405(g).  He has now moved for

summary judgment in the matter requesting that the court award disability or in the alternative, remand

the matter to the Commissioner for further proceedings.  The Commissioner has filed a cross-motion

for summary judgment asking the court to affirm the ALJ.

## III.    FACTUAL BACKGROUND AND MEDICAL HISTORY

Peters was born on February 9, 1964, and was thirty-nine years old at the time of the

administrative hearing.  He did not graduate from high school, but has earned a GED.  (T. 113.)  He

served two years in military service.  (T. 133.)  He has in the past worked as a truck driver for various

enterprises and a school bus driver.  (T. 124.)  He most recently performed clerical work for a trucking

company.  (T. 125.)   He is married and lives with his wife and their two children, ages thirteen and

eighteen at the time of the hearing.

He has related that he cooks, watches television, and bathes daily.  (T. 137.)  He drives, reads,

talks on the phone and pays bills weekly.  (*Id*.)  Monthly, he plays cards, visits relatives and friends,

talks to neighbors, and goes out to eat or to a movie.  (*Id*.)  He never does yard work, shops, fixes

2

things, participates in clubs or organization, attends sporting activities, or engages in exercise activities. (*Id.*)

He claims that he is unable to work because of recurring painful blistering on his face and nose due to shingles. (T. 109.) He describes the pain as excruciating. (*Id.*) He also indicates that he has bilateral arm pain with numbness and tingling. (T. 118.) He claims that he is unable to hold his head up for any length of time due to neck pain and aching in the back from arthritis. (*Id.*) He also claims that he had problems performing his most recent trucking job due to difficulties in standing and sitting because of neck and back pain and problems related to a hernia. (T. 109.) He states that he does not sleep well because he cannot get comfortable and that this lack of sleep affects his ability to function during the day. (T. 119.) Peters has been treated for, or diagnosed with, gastroesophageal reflux disease, herpes zoster and herpes simplex, tinnitus,[1] presbycusis,[2] and status post right hernia repair. (*See* T. 362.) He has also been diagnosed with a depressive disorder and an anxiety disorder. (T. 243, 244, 268.) His alleged disability onset date is March 20, 2001.

Peters underwent a hernia repair on January 18, 2001. (T. 151.) A pre-operative anesthetic risk and assessment exam indicated that Peters had no complaints of pain on percussion across the thoracic and lower vertebral bodies but that there was complaints of pain across the low cervical

---

[1]     Tinnitus is "a sensation of noise (as a ringing or roaring) that is caused by a bodily condition (as a disturbance of the auditory nerve or wax in the ear) and typically is of the subjective form which can only be heard by the one affected." *MedlinePlus: Medical Dictionary* at http://www.nlm.nih.gov/medlineplus/mplusdictionary.html.

[2]     "Presbycusis is the loss of hearing that gradually occurs in most individuals as they grow older." National Institute on Deafness and Other Communication Disorders at http://www.nidcd.nih.gov/health/hearing/presbycusis.asp.

vertebral bodies and at the C1-2 joint.  (T. 152.)  The treatment notes also indicate that the reported

discomfort did not restrict the active range of motion in the head and neck.  (*Id*.)  It was noted that

"[h]e moves easily and walks with normal gait."  (*Id*.)  Follow-up treatment notes indicate that the

surgery and recovery were successful and complete.

On April 12, 2001, Peters was seen at his primary care clinic regarding post operative

concerns for the repaired hernia.  A work ability form was filed out indicating no work restrictions.  (T.

269.)  Peters was also seen at the clinic by Dr. Mark Sprangers regarding a neck injury from

November 1991, and the subsequent disc damage.  (T. 268.)  Dr. Sprangers noted that Peters had

been bothered by increasing upper back, shoulder, and right arm dysfunction and pain.  (*Id*.)

Accordingly, Peters had decreased his work schedule.  (*Id*.)  Dr. Sprangers recommended that Peters

undergo a neurosurgical evaluation.  (*Id*.)

Peters returned on May 7, 2001, complaining of neck and back pain.  Dr. Sprangers

performed a trigger point injections treatment which resulted in "an amazing amount of relief."  (T. 267.)

Dr. Sprangers noted that Peters "still has been working, tolerating it very well," and was "[a]ble to

work a full shift at the current activities and hours."  (*Id*.)  On May 22, 2001, Peters was seen again by

Dr. Sprangers.  (T. 266.)  Peters presented complaining of a "muscle tension type headache" and was

given injections of Xylocaine and Marcaine[3] for pain relief.  (*Id*.)  Dr. Sprangers noted that Peters was

"renting a truck from a private owner and doing hauling as much as he could."  (*Id*.)

On May 26, 2001, Peters was seen by emergency room personnel for severe back pain and

---

[3]        Xylocaine and Marcaine are local anesthetics.  *MedlinePlus Drug Information* at
http://www.nlm.nih.gov/medlineplus/_druginformation.html.

spasms.  (T. 168.)  Treatment notes indicate that he was alert, but anxious.  (T. 169.)  He was given 75

mg of Demerol and 50 mg Vistaril.[4]  (T. 176.)  He was prescribed Vicodin for pain and Ativan for

pain.[5]  (*Id.*)  He was instructed to also use ice to treat the back pain.  (*Id.*)  A follow-up visit was

scheduled for three days later with his primary care physician.  (*Id.*)

On August 3, 2001, Peters was seen by Dr. Sprangers, complaining of back and arm pain and

requesting trigger point injections and a prescription for OxyContin.[6]  (T. 265.)  Dr. Sprangers

performed the requested trigger point injections, but counseled against the use of OxyContin.  (*Id.*)  He

noted that Peters was not working, while awaiting his evaluation by the neurosurgeon.  (*Id.*)  On

September 12, 2001, Peters presented at the clinic complaining of lightheadedness and disorientation.

(T. 264.)  The doctor noted that Peters upper and lower extremity strength and reflexes were normal.

He opined that the dizziness, which Peters reported is recurrent, may have been caused by a

hypoglycemic reaction.  (*Id.*)

On September 20, 2001, Peters met with neurosurgeon Dr. Walter E. Galicich regarding his

back pain.  (T. 208.)  Dr. Galicich recommended Peters undergo surgery to lessen the back pain that

he was experiencing.  (T. 209.)  On October 25, 2001, Peters visited his clinic complaining of trigger

point pain.  (T. 262.)  Dr. Sprangers provided injections of pain medication at the trigger points and

counseled Peters about the use of hot and cold to help alleviate the pain as well as the use of stretching

---

[4]        Demerol is a narcotic pain medication and Vistaril is an antihistamine used to control anxiety.  *Id.*

[5]        Ativan is  used to relieve anxiety and Vicodin is a combination of Acetaminophen and Hydrocodone Bitartrate (a narcotic analgesic) used to relieve moderate to moderately severe pain.  *Id.*

[6]        Oxycontin is used to relieve moderate to moderate-to-severe pain.  *Id.*

and exercise.  (T. 263.)  Dr. Sprangers explained that Peters was "off work at his own doing, staying

home with his children and raising beef calves."  (*Id*.)    On January 18, 2002, Dr. Sprangers again

noted Peters' involvement in raising beef cattle, when Peters visited the clinic complaining of continuing

pain and requesting the doctor prescribe OxyContin.  (T. 262.)  Dr. Sprangers denied the request for

OxyContin and again encouraged Peters to use exercise and stretching to help relieve the pain.  (*Id*.)

On February 4, 2002, Dr. Galicich performed an "anterior cervical discectomy and fusion with

spinal cord decompression and [cervical] plating."  (T. 181.)  "Upon completion, all neural structures

were well decompressed and appeared in good condition with no evidence of any injury or

cerebrospinal fluid leak.  A solid construct was achieved."  (T. 183.)  The following day, Peters was

released from the hospital.  (T. 180.)  The discharge notes indicate that there were no complications

from the surgery.  (*Id*.)  Additionally, it is noted that his strength was 5/5, sensation and swallowing

were intact, voice was strong, and he was wearing a cervical collar.  (*Id*.)

A radiology report on February 5, 2002, showed normal limits and normal alignment.  (T. 208.)

A certified nurse practitioner (CNP) examined Peters on March 8, 2002.  (T. 197.)  The CNP noted

that Peters was doing well postoperatively.  (*Id*.)  He explained that Peters had "tapered out of his

cervical collar on his own."  (*Id*.)  His physical examination showed his strength at 5/5, deep tendon

reflexes at 2/2, bilateral triceps reflexes at 0/2, and swallowing reflex intact.  Radiological report from

the same day indicate no changes from the February 5 exam in alignment and appearance and that the

swelling had been resolved.  (T. 206.)

On February 13, 2002, Peters reported to his primary care clinic complaining of pain despite

the surgery.  (T. 259.)  The doctor noted that Peters was in distress, even at rest.  (*Id*.)  After a

discussion with Peters and his wife, Dr. Sprangers agreed to prescribe a thirty day treatment of OxyContin for Peters' pain.  (*Id*.)  On March 5, 2002, Peters presented at the clinic still complaining of trigger point pain and explains that he had discontinued the use of all pain medication and inflamation medication due to tinnitus, or ringing, in his ears.  (T. 258.)  Later in the day he returned to the clinic due to severe pain in the thoracic regions brought on while he was taking a walk.  Dr. Sprangers advised him to "be less vigorous in his rehabilitations attempts."  (*Id*.)

On March 21, 2002, Peters again contacted his primary care clinic complaining of tinnitis.  (T. 255.)  He was immediately referred to Brian Coyle, MD, an ear, nose and throat specialist.  (T. 256.)  Dr. Coyle noted that the tinnitus has been constant and severe, with Peters rating the ringing as ten out of ten for severity, causing him to break down and cry.  (*Id*.)  Peters stated that he had occasional brief sharp pains in his neck radiating from his head, but he denied any other persistent headaches.  (*Id*.)  Dr. Coyle conducted an examination and recommended an audiogram.  (*Id*.)  Peters also called the neurosurgical clinic complaining of the ringing in his ears.  (T. 195.)  Peters explained that he had been occasionally taking Tylenol pm.  (*Id*.)  He discontinued its use thinking it was contributing to the ringing in his ears and was taking no other pain medication.  (*Id*.)  He reported that he was doing extremely well and had no weakness or sensory issues and pain was minimal.  (*Id*.)  He told the clinic personnel that he felt the surgery had been a "great success."  (*Id*.)

Peters reported that he was "doing very well" on April 5, 2002.  (T. 193.)  He explained that the pain he had experienced prior to surgery had disappeared after surgery, but had returned a week earlier when he had been completing physical therapy to increase his range of motion and strengthen his cervical spine.  (*Id*.)  Peters complained of "neck and shoulder pain that radiates from the right

7

posterior cervical down the shoulder and down the right arm to the . . . elbow." (*Id.*)  He denied

numbness in the hands or loss of strength.  (*Id.*)  Physical examination revealed that his strength was 5/5

in the upper and lower extremities bilaterally, deep tendon reflexes in the upper and lower extremities

were 2/2, and swallowing reflex was intact.  (*Id.*)  The CNP diagnosed Peters as having inflamation due

to the increased activity and range of motion exercises.  He prescribed Medrol Dosepak[7] to alleviate

the swelling.  (T. 194.)

On April 11, 2002, the records indicate that the Medrol Dosepak failed to provide relief for

Peters.  (T. 190.)  He described the pain as the "worst headache he had ever had."  (*Id.*)  He explained

that he had spent the past few days in bed because of the pain.  (*Id.*)  He also described pain and

tightness in his chest, although he had no difficulty breathing and no shortness of breath.  (*Id.*)  He

mentioned the ongoing problem with ringing in his ears.  (*Id.*)  Although the registered nurse (RN) who

spoke with Peters explained that the should be seen either by his primary care physician or emergency

room personnel regarding his chest pain, Peters was unwilling to follow that advice citing his lack of a

primary care physician and his disinclination to visit an emergency room.  (T. 191.)

Dr. Coyle indicated on April 16, 2002, that the audigram had returned with normal results. Dr.

Colye noted that the tinnitus seemed to increase with an increase in neck pain.  He recommended

primary pain management by Peters' primary care physician, Dr. Sprangers.  In addition, he suggested

that the treatment of other factors such as depression and anxiety could also assist in treating the

tinnitus.  Peters saw Dr. Sprangers on April 18, 2002, to discuss the thoracic spine MRI scan report.

---

[7]     Medrol Dosepak is a steroid used to reduce swelling and decrease the body's immune
response.

(T. 252.)  Dr. Sprangers noted that there was limited active range of motion of his head from the fusion

surgery.  He noted, however, that the circulation, motion, and sensation were intact in Peters' arms and

hands bilaterally.  (*Id*.)  Peters indicated that there was pain associated with deep palpitations over the

T3 to T9 area of the dorsal spine.  (*Id.*)  Treatment notes from examinations on April 23, 2002, and

July 2, 2002, indicate that Dr. Sprangers continued to emphasize his refusal to prescribe OxyContin.

(T. 261.)  He also mentions that he discussed in depth with Peters his use of pain medication and

concerns of his future employability.  (T. 248 & 251.)

On July 18, 2002, Peters again visited the neurosurgery clinic complaining of pain.  (T. 188.)

He stated that the medication had not helped alleviate the pain except for a Lidocaine injection that had

completely relieved the pain.  (T. 188.)  Dr. Galicich noted that Peters had 5/5 strength throughout,

sensation was intact, his reflexes were equal and symmetric throughout and he had full range of motion

of his cervical spine.  (*Id.*)

On August 15, 2002, Peters was seen by Michael Giorgi at his primary care clinic.  (T. 246.)

Dr. Giorgi noted that Peters was in for a recheck of chronic neck and back pain.  (*Id*.)  He also noted

that Peters was staying home raising beef cattle.  (*Id*.)  Dr. Giorgi stated that Peters' neck had "severely

decreased range of motion with moderate paravertebral muscle tenderness to palpation." (*Id.*)  Peters'

motor strength, gait, and reflexes, however, were normal and symmetric.  (*Id*.)  He also noted that

Peters was cooperative, exhibiting normal affect, with "no gross process defects during causal

conversations." (*Id*.)  He agreed to prescribe OxyContin.  (*Id*.)

Dr. Giorgi saw Peters again a month later on September 5, 2002.  (T. 245.)  During this exam,

Dr. Giorgi noted that Peters was tolerating the OxyContin well.  (*Id*.)  He noted that the pain had

decreased and Peters was able to participate in activities of daily living.  (*Id*.)  He also noted again that

Peters was raising beef cattle.  (*Id*.)

On November 26, 2002, Dr. Giorgi, completed a medical source statement of Peters' mental

ability to do work related activities.  (T. 222.)  Dr. Giorgi opined that, based on his clinical findings of

cervical disc degeneration and depression and Peters' self-reported limitations, Peters has a poor ability

to maintain attention and concentration for extended periods; perform activities within a schedule,

maintain regular attendance and be punctual; sustain an ordinary routine without special supervision;

work with or near others without being distracted by them; complete a normal workday or workweek;

perform at a consistent pace; interact appropriately with the public; respond appropriately to changes in

the work setting; and travel in unfamiliar places or use public transportation.  (T. 222-23.)  He noted

that Peters had a fair ability to remember locations and work-like procedures; understand, remember

and carry out detailed instructions; make simple work-related decisions; ask simple questions or

request assistance; accept instructions and respond appropriately to criticism from supervisors; get

along with co-workers and peers; maintain socially appropriate behavior; adhere to basic standards of

neatness and cleanliness; be aware of normal hazards and take appropriate precautions; and set

realistic goals or make plans independent of others.  (*Id.*)  He also noted that Peters has a good ability

to understand, remember, and carry out short, simple instructions.  (*Id.*)

Dr. Giorgi completed a form listing Peters physical abilities to do work-related activities.  (T.

224-26.)  He concluded that Peters could lift less than 10 pounds, stand and/or walk for less than 2

hours in an eight hour workday, must periodically alternate between standing and sitting, and should not

pull or push over ten pounds.  He also opined that Peters should never  climb, kneel, crouch, or crawl.

He described Peters as limited in reaching in all directions, and in gross and fine finger manipulations. He bases this on increased pain and decreased range of motion.  (T. 226.)

On December 17, 2002, Glenn Holman, PhD., a licensed psychologist, conducted a mental status evaluation.  (T. 227.)  After fully describing Peters' self reported limitations, Dr. Holman issued a diagnosis of major depressive disorder, single episode, moderate.  (T. 232.)  He stated that Peters has the mental capacities to concentrate and understand verbal instructions, to carry out tasks with reasonable persistence and pace the respect his physical limitations, to do reasonable well worth coworkers and supervisors, but may be more reactive to criticism or conflict.  Dr. Holman concluded that Peters would be expected to have a limited tolerance for stress in the workplace.  (*Id.*)

Aaron Mark, MD., completed a physical residual functional capacity assessment on January 18, 2003.  (T. 233.)  Dr. Mark concluded that Peters could occasionally carry or lift up to twenty pounds, frequently carry or lift up to ten pounds, sit, stand and/or walk about six hours in an eight hour workday, with no limitation on the ability to push or pull.  (T. 234.)  He noted that there were no postural limitations, such as stooping, kneeling, crouching or crawling, and no manipulative limitations, such as reaching in all directions. (T. 235-36.)  He also noted that Peters should be limited to avoid even a moderate exposure from machinery due to the use of pain medication.  (T. 237.)  Jacalyn A. Kawiecki, MD, concurred with Dr. Mark's assessment.  (T. 240.)

On March 10, 2003, Peters informed his physician that the tinnitus was better since he had begun chronic pain management.  (T. 365.)  On March 12, 2003, Peters complained of an injury to his left shoulder.  (T. 364.)  He apparently suffered a shoulder strain while lifting a laundry basket at home.

(*Id.*)  Dr. Giorgi noted that Peters' neck was supple with no cervical adenopathy[8] and motor strength was intact, but painful, and reflexes were normal.  (*Id.*)  On March 17, 2003, Peters presented at the clinic complaining of one day of low back pain.  (T. 362.)  Peters stated that he while he was getting up from his chair, he experienced acute pain and fell because "his back gave out."  (*Id.*)  He fell against a window and lacerated his finger on the broken pane.  (*Id.*)  This finger required four stitches.  (T. 363.)  Dr. Giorgi noted that Peters' neck had severely decreased range of motion.  (*Id.*)  Grip strength and reflexes were normal, however, and motor strength was intact.  (*Id.*)  Peters has the stitches removed ten days later.  (T. 359.)  At that time, Dr. Giorgi noted that one of the sutures had pulled out due to Peters "doing a lot of dishes."  (*Id.*)

Psychological counseling and the Chronic Pain Clinic have been suggested to Peters on multiple occasions.  (T. 347, 348, 352, 356, 359, 361.)  He has declined to follow through on these recommendations claiming a lack of transportation, money and awaiting the outcome of his disability hearing.  (*Id.*)  Drs. Giorgi and Sprangers have noted a decrease in the range of motion Peters' neck, but have also consistently noted that his extremity/motor strength, reflexes, and gait have remained normal and that he is cooperative, with normal affect and no gross thought process defects during casual conversation.  (*See, e.g.*, T. 347, 348, 351, 353, 354, 355, 357, 360, 361.)  It was noted that he was depressed due to the ongoing pain and his inability to work and would on occasion become emotional during discussions with his physicians about his physical problems and inability to work.  (T.

---

[8]     "Cervical adenopathy is enlargement of the cervical lymph nodes, which are located on both sides of the neck."  *See Webster's Online Dictionary* at
http://www.websters-online-dictionary.org/definition/english/ad/adenopathy.html

248, 361.)

From October 16, 2000, through June 03, 2002, Peters was seen by Dr. D.C. Spano for chronic intermittent herpes zoster of the nose. (T. 184-87.) Dr. Spano noted that Peters was susceptible to bouts of herpes when under stress. (T. 186.) He noted that Peters becomes very anxious during the breakout period. (T. 185.) Dr. Spano prescribed Percocet and Xanax.[9] (*Id.*)

## IV.   THE ALJ'S FINDINGS AND DECISION

The Agency has adopted regulations establishing a five-step procedure for determining whether a claimant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. §§ 404.1520(a)(4). The Eighth Circuit has summarized these steps as follows:

> The Commissioner must determine: (1) whether the claimant is presently engaged in "substantial gainful activity;" (2) whether the claimant has a severe impairment--one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity [RFC][10] to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Fines*, 149 F.3d at 895 (footnote added). In addition, if the claimant has a medical determined mental impairment, the ALJ must proceed through additional steps as outlined in § 404.1520a. According to § 404.1520a, the ALJ must rate the claimant's degree of limitation in four broad functional areas. §

---

[9]    Percocet is a combination medicine containing narcotic analgesics and acetaminophen used to relieve pain and Xanax is used to treat anxiety disorders and panic attacks. *Id.*

[10]    A claimant's RFC is the most the claimant can still do despite the claimant's physical and/or mental limitations. 20 C.F.R. § 404.1545.

404.1520a(c)(3).  These four areas are: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  *Id.*  The ALJ must rate the degree of limitations on a five-point scale: None, mild, moderate, marked, and extreme.  § 404.1520a(c)(4).  If by using these ratings the ALJ determines that the impairment is severe, but does not meet a listed impairment, the ALJ must assess the claimant's RFC as described in step four of the determination procedure.  § 404.1520a(d)(3).

In evaluating the claimant's RFC prior to step four, the ALJ must consider the claimant's subjective complaints.  In determining the credibility of those complaints, the ALJ looks to several factors as set out in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir.1984).  These factors include: daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions.  *Id.* at 1322.  These factors must be considered in the light of "the claimant's prior work record, and observations by third parties and treating and examining physicians."  *Id.*  "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."  *Pearsall v. Massanari,*  274 F.3d 1211, 1217 -1218 (8th Cir. 2001).

On May 15, 2004, ALJ Quayle issued his decision denying Peters' application for disability insurance benefits.  The ALJ determined that Peters' gastroesophageal reflux disease, herpes zoster and herpes simplex, tinnitus, presbycusis, and status post hernia repair are not severe impairments because they do not limit Peters' basic demands for work activity.  (T. 19.)  The ALJ determined that Peters is severely impaired by degenerative disc and joint disease of the cervical and thoracic spine, status post cervical disectomy and fusion, cervical disc displacement, and chronic pain syndrom.  (T. 19.)  The ALJ also found that Peters suffers from the medically determined mental impairments of a

14

depressive disorder and an anxiety disorder.  The ALJ evaluated the mental impairments under the guidelines as set forth in 20 C.F.R. § 404.1520a.  (T. 20.)   The ALJ concluded that the mental impairments mildly restricted Peters' activities of daily living, and that Peters had moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence and pace, and that there were no episodes of decompensation.  (T. 21.)  He found no evidence of C criteria. (*Id*.)  The ALJ then determined that Peters' mental and physical limitations, either individually or in combination, while severe, do not meet the criteria of a listed impairment which would automatically confer disability status to Peters.  Accordingly, the ALJ proceeded to determine Peters' RFC.  The ALJ acknowledged that Peters' impairments caused significant limitations, but nonetheless, determined that Peters "retains the residual functional capacity for lifting and carrying twenty pounds occasionally and ten pounds frequently, walking, standing, or sitting six hours of an eight-hour day, he should avoid hazardous machinery and heights, performing routine repetitive work with no detailed or complex tasks, with one or two step instructions, and brief and superficial contact with co-workers and supervisors." (T. 22.)  Based on this RFC and the testimony of the vocational expert, the ALJ determined that Peters was not able to perform his past relevant work as a truck driver.  (T. 29.)  The ALJ decided that given Peters' age, education, relevant work history, determined RFC, and taking into account the testimony of the vocational expert, there was a significant number of jobs within the regional economy that he would be able to perform.  (*Id.*)  Thus, the ALJ concluded that Peters was not entitled to disability insurance benefits at any time through the date of the decision.  (*Id.*)

V.      DISCUSSION

        A.      *Standard of Review*

This court will affirm the ALJ's findings that the claimant was not under a disability if the findings are supported by substantial evidence based on a review of the entire record. *Haley v . Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support the decision." *Id.* (quoting *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)). The review the court undertakes, however, must go beyond solely the examination of the record for evidence in support of the Commissioner's decision. *Id.* The court must additionally examine the record for evidence that detracts from that decision. *Id.* Nevertheless, as long as there is substantial evidence to support the decision, this court will not reverse it simply because substantial evidence exists in the record that would support a contrary outcome or because this court might have decided differently. *See id.*

        B.      *Analysis of Decision*

Peters claims that he was wrongly denied disability insurance benefits because the ALJ (1) improperly questioned Peters' credibility of his subjective complaints of debilitating symptoms because these complaints were supported by medical evidence; (2) the ALJ erred in determining Peter's RFC by disregarding the opinion of Dr. Giorgi, Peters' treating physician; and (3) the Commissioner failed to meet the burden of demonstrating that Peters' could perform work that exists in significant numbers in the national economy. (Pl. Mem. at 7, 12, 14.)

        1.      Peters' Subjective Complaints

The ALJ found that Peters' allegations and subjective complaints were not fully credible when

16

considered in the light of the evidence in the record.  (T. 22.)  The ALJ observed that even though Peters claimed that he was unable to grasp items and that he no longer used glass as a container to drink from because he his grip would unexpectedly release, there was no support for this claim in his medical records.  The judge observed that examination notes reported 5/5 strength in upper and lower extremities, normal grip strength, and Peters had denied weakness in the arms.  (T. 27.)  The ALJ discredited Peters' complaints of disabilitating  headaches noting that Peters denied any ongoing headaches and that the record reflected headaches that were intermittent and infrequent.  (*Id.*)  The ALJ also discredited Peters' claim that he cannot hold his head up and must lie down for most of the day.  (*Id.*)  The ALJ noted that all the objective medical findings indicated that medication was controlling the pain, that Peters had fair range of motion, that his spine was in good alignment, and that Peter's complaints of pain were a result of failure to take pain medication.  (*Id.*)  *See Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir.1993) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.").

The ALJ noted that treatment records indicate that Peters reported good relief with OxyContin and that after taking OxyContin, he was able to do household chores.  (T. 28.)  The ALJ described other consistencies in the record.  (*Id.*) The ALJ noted that although Petes had stated that he did not drive due to the pain, he had claimed in the Activities of Daily Living Questionnaire that he drives weekly.  (*Id.*)  The ALJ additionally noted that two of Peters primary care physicians, Drs. Giorgi and Sprangers, reported that Peters was raising beef cattle.  (*Id.*)  Although Peters claimed that this was a misunderstanding, the ALJ, observing that two different doctors on two different occasions had recorded Peters claims of raising beef cattle, declined to accept Peters' explanation.  (*Id.*)

17

The court notes that there is some evidence in the record, pointed out by Peters, that supports his claim of disability.  The court finds, however, that the ALJ's decision is based on substantial evidence in the record.  *See Vandenboom v. Barnhart*, 412 F.3d 924, 927 (8th Cir. 2005) ("If, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.") (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir.2004)).  Thus, the court concludes that the ALJ properly discredited Peters' subjective complaints when determining Peter's RFC.

2.      The ALJ's Determination of Peters' RFC

Peters claims that the ALJ erred in determining his RFC because he failed to give the proper weight to the opinion of his treating physician, Dr. Giorgi.  Generally, the ALJ must grant controlling weight to a treating physician's opinion "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."  *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005).  The treating physician's opinion does not automatically control the ALJ's decision, but first must be compared to the record as a whole.  *Id*. An ALJ may decide to discount or totally disregard a treating physician's opinion "where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  *Id*. at 921 (internal quotation marks omitted).  If the ALJ chooses to disregard or discount the treating physicians' opinion, the ALJ must provide "good reasons" as to why the opinion was discounted.  *Id.*

Here, the ALJ discounted Dr. Giorgi's more restrictive medical opinion regarding Peters' mental functional abilities noting that Dr. Giorgi was a family practice physician and not a mental health

specialist.  (T. 25.)  He also found that Dr. Giorgi had placed too much emphasis on Peters' subjective

allegations, which the ALJ had determined lacked credibility.  (*Id*.)  The ALJ noted that Dr. Giorgi's

opinion was not substantiated by objective medical evidence.  (T. 26.)  Based on these considerations,

the ALJ declined to grant Dr. Giorgi's opinions controlling weight and granted significant weight to the

observations of Peters' treating neurosurgeon and the opinions of Dr. Holman, a consulting

psychological examiner, and Dr. Kuhlman, Ph., L.P., with respect to Peters mental impairments.  In

addition, the ALJ granted significant weight to Drs. Kawiecki and Mark, state agency consultants, with

respect to Peters' physical impairments, because their opinions were consistent with the medical

evidence.  (*Id*.)  The ALJ observed that there were inconsistencies between Dr. Giorgi's assessment

and his treatment notes regarding Peters' functional impairments.

   The court finds that the ALJ has provided good reasons as to why he discounted Dr. Giorgi's

opinion.  In addition, a review of the entire record supports the ALJ's decision declining to grant

controlling weight to the treating physician's opinions and granting significant weight to the opinions of

non-treating, but specialist medical examiners and opinions of examiner's consistent with the medical

evidence.  Thus, the court concludes that the ALJ's determination of Peters' RFC is based on

substantial evidence.

   3.   The ALJ's Finding that the Commissioner Had Satisfied Her Burden of Proof

   Because the ALJ determined that Peters could no longer perform his past relevant work, the

burden shifted to the Commissioner to demonstrate that there are a significant number of jobs in the

regional economy that Peters is able to perform based on his RFC.[11]  *See* 20 C.F.R. § 404.1560(c). The ALJ determined, based on a hypothetical posed to the vocational expert, that there existed within the regional economy a significant number of jobs that Peters could perform.  Peters argues that the ALJ failed to give an appropriate hypothetical to the vocational expert because the ALJ had erred in determining Peters' RFC.  Because the ALJ properly discounted Peters' subjective allegations of impairments and provided good reason why he disregarded Dr. Giorgi's opinions and, therefore, properly determined Peters' RFC, the court finds that the hypothetical as posed to the vocational expert, was based on substantial evidence in the record as a whole.  The vocational expert testified to that there were over 30,000 jobs in the state of Minnesota that a person with the limitations as posed in the hypothetical could perform.  Having posed a proper hypothetical to the vocational expert, the ALJ did not err in relying upon the vocational expert's testimony that there are a significant number of jobs in the national economy.  *Harris v. Barnhart*, 356 F.3d 926, 931-932 (8th Cir. 2004).  Accordingly, the court concludes that the ALJ did not err in finding that the Commissioner met the requisite burden of proof.

## VI.    CONCLUSION AND RECOMMENDATION

        Based on the foregoing discussion, the court concludes that the ALJ did not error in finding that Peters' failed to meet the criteria for disability insurance benefits under the regulations of the social security agency.  Accordingly, the court **recommends** that Peters' Motion for Summary Judgment [Docket No. 9] **be denied** and the Commissioner's Motion for Summary Judgment [Docket No. 12]

---

[11]        Peters incorrectly argues that the burden shifts to the ALJ.  (*See* Pl. Mem. at 14.)

**be granted**.

Dated:   September 12, 2005

                                         s/ Arthur J. Boylan
                                         Arthur J. Boylan
                                         United States Magistrate Judge

NOTICE

       Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before September 28, 2005